George C. MATTHIES

v.

The SEYMOUR MANUFACTURING COMPANY et al.

George C. MATTHIES

v.

Earl B. BOIES et al.

Civ. Nos. 7303, 7304.

United States District Court
D. Connecticut.

Dec. 9, 1958.

**68**

Leo V. Gaffney, New Britain, Conn., John P. Hodgson, Hartford, Conn., Robert M. Fitzgerald, Litchfield, Conn., for plaintiff.

Joseph P. Cooney, Hartford, Conn., for Seymour. Mfg. Co.

David Goldstein, Bridgeport, Conn., for H. Meade Alcorn, Jr.

William Timbers, Darien, Conn., for Raymond E. Hackett, Earl B. Boies, H. George Carroll and Francis P. Schiaroli.

John K. Holbrook, New York City, for Janet P. Redmond and Louis J. McMillan.

J. JOSEPH SMITH, Chief Judge.

In these companion actions, one a class action by a beneficiary of a trust, and the other a derivative shareholder's action by the same person as a holder of equitable interest in corporate shares through the trust, defendants move to dismiss.

*Memorandum on Jurisdiction*

In Civil 7304, plaintiff, George C. Matthies, has brought suit "on behalf of himself and all other beneficiaries of the trusts created by George E. Matthies and Annie W. Matthies," both deceased, against the three trustees of those trusts. Earl B. Boies, Raymond E. Hackett, and H. George Carroll, individually and as trustees under the wills of George E. and Annie W. Matthies, two attorneys, H. Meade Alcorn and Francis F. Schiaroli, who have represented various interests in connection with these trusts, and also Janet P. Redmond and Louise J. McMillan, trustees of a trust created by the will of a former trustee (Franklin Starr Jerome) of both Matthies trusts.

Plaintiff's voluminous complaint sets out a variety of allegations of misconduct and dereliction of duty on the part of the original Matthies' trustees beginning in 1922 and continuing up to the present day through the participation of the present trustees; gross and unjustifiable overpayments to the two defendant attorneys for services rendered are also alleged, both out of income and out of corpus of the trusts; failure of the present trustees to press claims of a substantial nature against the estate of Franklin Starr Jerome who, while serving as trustee of both trusts, is alleged to have appropriated large amounts of property of a corporation (control over which was obtained by reason of trust ownership of stock of the corporation) is further alleged to be the basis of a prayer for the imposition of a constructive trust on the property now held by the defendant trustees under the will of Jerome, for the benefit of the Matthies trusts.

The complaint alleges that George C. Matthies, the plaintiff, is a citizen of California, and that six of the defendants are citizens of Connecticut and one a citizen of New York. Plaintiff alleges that he is bringing the action for himself and all other beneficiaries of the Matthies trusts, not for their personal benefit directly, but for the benefit of the trusts. He alleges that there are thirty-three (33) living persons with either vested or contingent interests in these trusts, and an unknown and undeterminable number of unborn beneficiaries, thus making it impracticable to bring all before the Court; furthermore, it is claimed that there is an absolute community of interest among each and every beneficiary of the trusts as to the necessity of removal of unfit trustees and as to the recovery of monies which are properly owing to the trusts; it is further claimed that plaintiff is an adequate representative of these other beneficiaries, being a beneficiary himself.

The complaint is in two counts. The first outlines plaintiff's claim of a continuing conspiracy of hidden fraud, misconduct, etc., by the defendants. The second is based on the alleged failure of the defendant Matthies trustees to post a bond, with the claimed result that these defendants are not, in law or equity, the trustees of the Matthies trusts.

A variety of different forms of relief are sought:

(1) That the defendant Matthies trustees be adjudged to hold no title to the position of trustee and removed from same.

(2) That a receiver be appointed for these trusts, pending appointment of new trustees.

(3) That the Court appoint new trustees should the adult beneficiaries fail to agree on selecting new trustees.

(4) That the defendant Matthies trustees and the defendant attorneys be required to account to said trusts for all fees of whatever nature which were wrongfully taken from the trusts, or from a corporation wholly owned by the trusts.

(5) That the defendant Matthies trustees be enjoined and restrained from setting up, or attempting to set up, various decrees of the Probate Court of the Derby, Connecticut District approving their accounts by way of defense, and that said decrees be adjudged null and void because procured by fraud and misrepresentation.

(6) That the defendant Jerome trustees be adjudged to hold certain property in constructive trust for the benefit of the Matthies trusts.

(7) That the defendant Jerome trustees be ordered to turn over the property so held in constructive trust to the Matthies trusts, along with all proceeds, profits, and income therefrom.

(8) That the Court grant such further and general relief as the circumstances of this case and principles of equity require.

The relief thus sought may be denominated under the following general headings: (1) removal of trustees, (2) appointment of a receiver, (3) appointment of trustees, (4) accounting by trustees and others, (5) injunctive relief, (6) constructive trusts, (7) restoration to the corpora of trusts of property wrongfully transferred therefrom, (8) general equitable relief.

It is obvious that the complaint has been drafted so as to bring this action within the ambit of Rule 23(a) of the Federal Rules of Civil Procedure, 28 U. S.C.A., pertaining to "class actions", as the language employed closely parallels that of the Rule.

The defendants have countered with an equal variety of claims, most of them running to the jurisdiction of this Court. At one point in these proceedings, defendants claimed that regardless of jurisdiction this suit should be enjoined as vexatious litigation, aimed at harassing these defendants and compelling them to assent to various ulterior de-

mands of certain Matthies beneficiaries, and that they were instituted with malice and without probable cause. As to the jurisdiction, it is claimed by defendants that this is not a class action, that as such the failure to join certain indispensable parties, the joinder of whom would destroy complete diversity, is fatal to the jurisdiction over the persons involved; furthermore that this Court has no jurisdiction over the subject matter of this action by reason of a continuing *in rem* jurisdiction over these matters in the Connecticut Probate Court, and finally that the action has been collusively brought to confer jurisdiction on this Court, in violation of 28 U.S.C. § 1359.

The "vexatious suit" aspect of defendants' claims, apart from any bearing it may have on jurisdictional issues, has been laid at rest by a finding by this Court on July 3, 1958, that plaintiff had "probable cause" to bring suit, as that phrase is usually understood with regard to such suits, i. e., probable cause as to the merits of his claim.

Although no written motion has been filed by the defendant Matthies trustees and the defendant attorneys, it would appear appropriate to regard the jurisdictional issues raised by these defendants as having been presented by a motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure, and to treat them accordingly.

The various points raised by defendants will be taken in turn.

### I. *Jurisdiction Over The Parties*

Defendants claim that this is not a class action and that the indispensability rule, Shields v. Barrow, 1854, 17 How. 129, 130, 15 L.Ed. 158, forbids District Court jurisdiction on two counts:

(1) that it would be unconscionable to issue a decree here without joining as plaintiffs all persons whose interests will be directly affected;

(2) that such a joinder would destroy diversity jurisdiction because these indispensable parties are citizens of Connecticut, as are some defendants.

Upon review of plaintiff's complaint it appears that the nature of certain of the types of relief sought would normally require the joinder of all other beneficiaries of these trusts as indispensable parties.

In 3 Moore's Federal Practice, para. 19.08, p. 2158, it is said:

"Where rights in a trust are involved in an action against the trustee, all beneficiaries whose interest in the estate will be affected must be before the Court. But all the beneficiaries of a trust are not indispensable in an action to remove the trustee for misconduct."

The nature of the relief sought in a given proceeding thus has a definite bearing on the indispensability or lack of it of the beneficiaries of a trust. Franz v. Buder, 8 Cir., 1926, 11 F.2d 854, was a suit by a remainderman against one of the trustees of a trust for an accounting and to establish an interest in stock dividends received by the trustee; it was held that the holder of the life estate (the income beneficiary) and all other remaindermen beneficiaries of the trust were indispensable to the maintenance of this suit. The basis of the decision appears to be that it was not so much plaintiff's demand for an accounting that made these other parties indispensable as it was his demand that his interest be determined.

"Before there could be an accounting concerning the property, it would be essential to determine whether or not the plaintiff still owned a remainder, and, if so, the property to which it attached. Such determination likewise would be necessary before the court could decide the amount of any security required. Therefore, at the very threshold of the case the court would have to determine as between the owner of the life estate, and the

owners of the remainder, whether or not the stock dividends belonged to corpus or to income, and whether or not the remainder interest had been discharged by payments and advances made by Sophie Franz. We fail to see how any possible decree could be framed granting any part of the relief prayed for without a determination of those issues. It follows that Sophie Franz, who is the owner of the life estate, and the living children and heirs of deceased children, who are the alleged owners of nine-tenths of the remainder estate, are indispensable parties, because they have such an interest in the subject matter of this controversy that, without directly affecting their interests, a final decree could not be rendered between the present parties to the suit." 11 F.2d at page 857.

 Clearly then, when the relative interests of the beneficiaries of a trust are directly involved in the litigation, all such beneficiaries must be joined. But the final sentence of the quotation from 3 Moore, supra, indicates that not every action brought by a beneficiary requires the joinder of every other beneficiary. In Wesson v. Crain, 8 Cir., 1948, 165 F.2d 6, two of the beneficiaries of a business trust brought suit for the removal of one of two trustees; as between the plaintiffs and the trustee there was the requisite diversity; however, there were thirteen beneficiaries altogether; five of the eleven not joined were citizens of the same state as defendant; the claim was made that these beneficiaries were indispensable. If this were so there could be no diversity jurisdiction. Shields v. Barrow, supra. Citing several state authorities, the 8th Circuit Court of Appeals held that these other beneficiaries were not indispensable, that one of several beneficiaries may have a trustee removed if he has so misconducted himself that he ought to be removed.

 In this action plaintiff seeks not only the removal of trustees, accounting by trustees, appointment of a receiver, and appointment of new trustees —all forms of relief which would not require the joinder of other beneficiaries as indispensable parties. Wesson v. Crain, supra; Bowles v. Superior Court, 1955, 44 Cal.2d 574, 283 P.2d 704—but plaintiff also seeks relief which may vitally affect whatever interests the other beneficiaries of the Matthies trusts have in the corpora of the trusts: the restoration to the trusts of money and property alleged to have been wrongfully diverted therefrom, both from income and from corpus, and, in effect, the reopening of the trustee's accounts for prior years. Surely all possible beneficiaries of the trusts have a stake in such proceedings. There is ample authority that an action of this type requires the joinder of both life beneficiaries and remaindermen. Franz v. Buder, supra; Talbutt v. Security Trust Co., D.C.E.D.Ky.1938, 22 F. Supp. 241; Baird v. People's Bank & Trust Co. of Westfield, 3 Cir., 1941, 120 F.2d 1001, 136 A.L.R. 693. See also State of Washington v. United States, 9 Cir., 1936, 87 F.2d 421, at pages 427, 428. Having decided to join causes or claims for relief which require the presence of all beneficiaries with others which have no such requirement, plaintiff has placed this case in such a posture that, in equity and good conscience, all the beneficiaries must be before this Court as indispensable parties. Shields v. Barrow, supra; State of Washington v. United States, supra. But this case differs from the usual "indispensable party" case because the claim is also made here that the plaintiff represents a "class" of beneficiaries all of whom should be parties to the suit, but who need not be joined because the Federal Practice allows one person to represent them all.

This, of course, immediately raises the question: who are the beneficiaries of these trusts? The two trusts created interests which, practically speaking, and

with regard to the normal incidence of life and death, will place the Matthies inheritance in substantially the same individuals. However, from the point of view of the law of future interests, the interests are technically of great variety, both as to kind and degree.

The principal dispositive provisions of the wills of George E. and Annie W. Matthies are set out in Appendix A attached hereto.

The following living persons have an interest of one sort or another in the Matthies trusts, under the terms set out in Appendix A:

(1) Bernard H. Matthies and Katherine Matthies, children of the testator and testatrix.

(2) George C. Matthies, Richard L. Matthies, William W. Matthies, Franklyn B. Matthies and Roberta I. Matthies, all children of Bernard Matthies, and grandchildren of the testator and testatrix.

(3) a. Linda Matthies, an infant, child of George C. Matthies;

b. Storm K. Matthies, Richard L. Matthies, Jr., Paul C. Matthies, all infants, all children of Richard L. Matthies;

c. Guy F. Matthies, an infant, child of Franklyn B. Matthies;

d. Dwight Matthies and Jane Matthies, both infants, both children of William W. Matthies.

(Katherine Matthies is 54 years of age, unmarried and childless. In law, however, her possibility of issue is not extinct. Nothing in the present record discloses the marital status of Roberta Matthies, but presumably she is unmarried and childless.)

(4) Ruth Wooster, sister of Annie W. Matthies.

(5) George Herbert Merrill and William Merrill, sons of Clara Wooster Merrill, deceased sister of Annie W. Matthies, and consequently nephews of Annie W. Matthies.

(6) William Merrill, Jr., Jack Merrill, Imogene Merrill Dowdell, and Robert Merrill, children of William Merrill, and grandnieces and nephews of Annie W. Matthies.

(7) The two infant children of William Merrill, Jr.

(8) The three infant children of Jack Merrill.

(9) The four infant children of Imogene Merrill Dowdell.

(10) The four infant children of Robert Merrill.

The number of persons having interests in these trusts is thus seen to total 34. The nature of the interests they hold varies from person to person; the following is a breakdown of these interests:

The George E. Matthies Trust.

The residue of the estate of George E. Matthies was divided into nine, equal shares, and is presently held in trust; at the time of the testator's death, the following interests were created:

A. As to ⅓ (%) of the Trust Fund—

1. a life estate in Annie W. Matthies;

2. a remainder in Katherine as to the income of 2 of the 9 shares for life (vested, subject to defeasance; this remainder has since ripened into possession as a result of the death of Annie W. Matthies.)

3. a remainder in the lineal descendants of Katherine as to ⅔ of principal (contingent, as none existed then, nor do any exist now).

4. a remainder in Bernard as to ⅔ of principal (contingent upon Katherine's death without surviving lineal descendants).

5. remainders in the lineal descendants of Bernard (contingent upon the death of Katherine without surviving lineal descendants and the death of Bernard prior to Katherine's).

6. a remainder in Bernard as to ⅑ share of the principal (vested, subject to complete defeasance, subject to an exec-

utory interest in Bernard's lineal descendants; this remainder has since ripened into possession as a result of the death of Annie W. Matthies).

7. a remainder as to the income of a ⅛th share in Katherine for her life (contingent upon the death of Annie W. Matthies and prior death of Bernard without lineal descendants; the possibility of this remainder's vesting has been destroyed by Bernard's survival of Annie W. Matthies).

8. remainders in the lineal descendants of Katherine (contingent upon the death of Bernard without lineal descendants prior to the death of Annie W. Matthies, and ultimately, the death of Katherine).

B. As to ⅔ of the Trust Fund—

1. a life estate in Bernard.

2. remainders in the lineal descendants of Bernard (vested subject to open. It is not quite clear from the language of the will whether these remainders are also subject to complete defeasance, conditioned on a lineal descendant's death prior to the death of the life estate holder, Bernard).

3. a remainder in Katherine as to the income of ⅔ of the principal for her life (contingent upon Bernard's death without lineal descendants).

4. remainders in the lineal descendants of Katherine as to a ⅔ share of principal (contingent upon Bernard's death without lineal descendants and, ultimately, survivorship past the time of Katherine's death; it is arguable, however, that survivorship until the date of Bernard's death only is required for inclusion in this class).

C. As to ⅙ of the Trust Fund—

1. a life estate in Katherine.

2. a remainder in the lineal descendants of Katherine (contingent, because none *in esse*; were any *in esse* they would have a vested remainder subject to open; possibly subject to defeasance also, as in subsection B(2), supra).

3. a remainder in Bernard as to the income of a ⅙ share for his life (contingent upon Katherine's death without lineal descendants).

4. a remainder in the lineal descendants of Bernard as to a ⅙ share of the principal (contingent upon Katherine's death without lineal descendants and, ultimately, survivorship past the date of distribution; whether that be the date of Katherine's death without lineal descendants or Bernard's death is not clear).

The Annie W. Matthies Trust.

The residue of Annie W. Matthies' estate was divided into two equal shares to be held in trust; at the time of Annie W. Matthies' death the following interests were created:

A. As to ½ of the Trust Fund—

1. a life estate in Bernard Matthies;

2. a remainder in the lineal descendants of Bernard who survive him (contingent; under express terms of will members of class must survive to take; they take no vested interest until Bernard dies).

3. a remainder in Katherine (contingent upon Bernard's death without surviving lineal descendants).

4. a remainder in the surviving lineal descendants of Katherine (contingent upon Katherine's death prior to Bernard's death without lineal descendants surviving him and survivorship past the date of Bernard's death).

5. a remainder in the next of kin of Annie W. Matthies who survive Bernard, principal to be divided according to Connecticut intestate succession laws relative to personal property (contingent upon Bernard's death without lineal descendants surviving him, preceded by Katherine's death without lineal descendants surviving her).

B. As to the other ½ of the Trust Fund—

1. a life estate in Katherine Matthies;

2. a remainder in the lineal descendants of Katherine who survive her (contingent in same sense as A(2) above).

3. a remainder in Bernard Matthies (contingent upon Katherine's death without surviving lineal descendants).

4. a remainder in the lineal descendants of Bernard (contingent upon Bernard's death prior to Katherine's death without lineal descendants surviving her, and survivorship past date of Katherine's death).

5. a remainder in the next of kin of Annie W. Matthies who survive Katherine, principal to be distributed according to Connecticut intestate succession laws relative to personal property (contingent upon Katherine's death without lineal descendants surviving her preceded by Bernard's death without lineal descendants surviving him).

Appendix B, attached hereto, shows the interests which the beneficiaries of these trusts presently possess. It can be seen that each beneficiary of these trusts holds a variety of interests when gauged according to the niceties of the law. Only two of them, Bernard and Katherine Matthies hold interests vested in possession and enjoyment at the present time, but these two also possess a great number of contingent interests similar in kind and degree to contingent interests held by the other remainderman beneficiaries. If there is, in any sense, a common characteristic attributable to all possible beneficiaries of these trusts it is found in their ownership of these various contingent interests. There are in existence today 34 persons whose interests in these trusts, as shown, run the gamut from those presently enjoying, and those who are almost certain to enjoy, to those whose actuarial chances of enjoyment are almost nil. Still, they are all "beneficiaries". The defendants maintain that, at most, only eight of them are indispensable to a decision in this case. These persons are: Bernard and Katherine Matthies, the five children of Bernard Matthies, and a guardian ad litem for unborn remaindermen and the greatgrandchildren of the testator and testatrix, George and Annie Matthies.

■ Defendant relies on the theory of virtual representation and argues that under this theory there is no reason for requiring the presence of any members of the Wooster and Merrill families. Thus the doctrine of virtual representation is employed to attack the claim of plaintiff that this is properly a class suit within Rule 23(a) of the Federal Rules of Civil Procedure. The doctrine of virtual representation was born of necessity as a means of accomplishing justice in suits where equity and good conscience required the compulsory joinder of all interested persons, but impossibility or impracticality precluded such joinder.

"The doctrine * * * is based upon the theory that there is some party before the court whose interests in the issue to be decided are so identical with or closely similar to the interests of the absent person that in protecting his own interests the representative party will bring forward such matter and take such action that, as a necessary by-product, the court will have before it an adequate presentation of the interests which the absent person has in common with him." Roberts, Virtual Representation in Actions Affecting Future Interests, 30 Ill.L. Rev. 580, 581.

■■ Today, when we speak of "indispensable parties" we refer to those whose joinder in a suit is compulsory. 3 Moore, Section 19.03, p. 2104; Shields v. Barrow, supra. Defendants' position seems to be that for purposes of a class suit, the persons in the class are the representatives, not the represented. This appears to be completely erroneous. The class suit had its origin in the same "necessity" which spawned the doctrine of virtual representation. Moore explains the evolution as follows:

"Class suits evolved in English equity through necessity. In order to do complete justice compulsory joinder of all interested persons became the general, accepted rule in chancery. But this rule, relentlessly applied, would preclude decision of cases where it was impracticable or impossible to get all the interested persons before the court. The class action was both an escape from and an adjustment to the rule of joinder. Its utility and the impracticability of any other type of procedure gave impetus to its development." 3 Moore, Section 23.02, p. 3411; Hansberry v. Lee, 1940, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22; Montgomery Ward & Co., Inc., v. Langer, 8 Cir., 1948, 168 F.2d 182.

"Classes" are also relevant in cases where virtual representation is employed, although these may not be class suits within the meaning of Rule 23(a) (1).

"These cases make it clear that a 'class' for purposes of representation is a group of persons whose interests in the questions at issue in the proceeding are so closely similar that an adequate representation of the legal position of one of them will accomplish the same purpose as would be achieved were all of them present and participating in the proceeding." Roberts, Virtual Representation in Actions Affecting Future Interests, supra, at 589.

The true class suit then, is a refinement of the doctrine of virtual representation, for "virtual representation" is the essence of the true class suit, i. e., the notion that through the appearance of one, many persons can be bound. Whether the theory that a court proceeds under be one of "virtual representation" or that of "a true class suit", the class consists of those represented, not the representatives alone.

George C. Matthies purports to represent thirty-four individuals; all these individuals hold some sort of interest in the two trusts with which we are here concerned. Defendants maintain that these can be represented by eight "indispensable parties". As has already been said, to speak of "indispensable parties" or "indispensability" is to paraphrase the words "compulsory joinder"; the represented ones, i. e., the members of the class, are the "indispensable parties" whose compulsory joinder would be necessary unless the class suit device were available, not merely the representatives who become the formal parties to the action. In arguing that these interested parties can be "represented" by eight persons, defendants implicitly admit the existence of a class of persons to be represented. The persons who make up this class, as has been seen, hold a variety of interests, most of which are similar in kind, even though some are dissimilar in degree. One thing common to all, however, is an interest in the preservation of these trust funds for the ultimate beneficiaries whoever of these persons they may be. Thus the real question here is not should they be represented by eight persons, but can they be represented by one?

Before a true class action will be allowed, the plaintiff representative must meet the positive requirements of showing that the members of the class he represents are so numerous as to make it impracticable to bring them all before the Court, and that he will adequately represent those not before the Court. Sheer quantitative measurement is not the test of impracticability; rather, the circumstances surrounding each case are determinative in conjunction with the number involved. The party claiming the right to represent others has the burden of proving facts showing the impracticability; the finding as to impracticability or lack of it is peculiarly within the discretionary powers of the trial judge, since his knowledge of the facts places him in the most advantageous position for making this decision. In re Englehard & Sons, 1914, 231 U.S. 646, 34 S.Ct.

258, 58 L.Ed. 416; Pacific Fire Ins. Co. v. Reiner, D.C.E.D.La.1942, 45 F.Supp. 703; 3 Moore's Federal Practice, Section 23.05, p. 3422.

What is the number of people we are concerned with here? Defendants argue that the contingent remainders of the Wooster and Merrill interests are so remote as not to deserve consideration as members of the class that plaintiff purports to·represent; they cite the high improbability that such remainders will ever vest in any member of the Wooster or Merrill families as the reason for this exclusion. In view of the specific provisions in the will of Annie W. Matthies creating these remainders, this Court cannot ignore the fact that these members of the Wooster and Merrill families possess legally cognizable rights which the testatrix intended they should have; to ignore the existence of these rights would be an arbitrary act of callous indifference; only the passage of time and events beyond the control of any human agency will determine who will ultimately take these funds. Insofar as their preservation is concerned, this Court must recognize the rights of all persons therein, however remote. To argue, as defendants do, that the Wooster and Merrill interests should not be included in the class because represented by presumptive remaindermen under the doctrine of virtual representation is self-defeating. To say that they can be represented is to admit that they have rights in common with some other members of the class. George S. Matthies, the plaintiff herein, is one of the "presumptive remaindermen" of whom defendants speak. If George E. Matthies could represent these remaindermen under the theory of virtual representation, he should be able to represent them under the theory of the "true class suit" as embodied in Rule 23(a) (1), so long as the numerical impracticability and adequate representation tests of that Rule can be met. There being no particular magic in numbers (compare Atwood v. National Bank of Lima, 6 Cir., 1940, 115 F.2d 861 (39 not impractical), and Citizen's Banking Co. v. Monticello State Bank, 8 Cir., 1944, 143 F.2d 261 (40 impracticable)), the circumstances relative to these class members must be looked to before any decision can be made. It appears that the joinder· of all the members of the class would be quite difficult. Nineteen of these individuals live outside the jurisdiction, eleven in New Jersey and eight in California. The impracticality of requiring such far flung individuals to *join* in the prosecution of an action in the District of Connecticut, coupled with the total number of all concerned, is sufficient for a decision that they are so numerous as to make it impracticable to have them joined.

The plaintiff in a true class suit must also "fairly insure the adequate representation of all". Once again the facts of each particular case control the decision to be made. Weeks v. Bareco Oil Co., 7 Cir., 1941, 125 F.2d 84.

"In determining the question the court must consider (1) whether the interest of the named party is co-extensive with the interests of the other members of the class; (2) whether his interests are antagonistic in any way to the interests of those whom he represents; (3) the proportion of those made parties as compared to the total membership of the class; (4) any other factors bearing on the ability of the named party to speak for the rest of the class; and (5) the type of class action involved—whether true, hybrid, or spurious." 3 Moore's Federal Practice, Section 23.07, p. 3425.

In considering these factors, the following conclusions have been reached.

The gravamen of this lawsuit is the preservation of the Matthies trust funds. That all persons who may benefit from a trust fund have a community of interest in the preservation of such fund is self evident. Technically, the interests of the beneficiaries may not be

"co-extensive"; but they are co-extensive in the sense that if the funds are increased by the restoration of amounts wrongfully diverted, all will benefit, be they income or corpus beneficiaries. Defendants maintain that the plaintiff here is a corpus beneficiary and that his interests are antagonistic to the income beneficiaries he purports to represent. It should be pointed out that these income beneficiaries also possess substantial contingent interests in the corpus of these trusts. See Appendix B. The antagonism required to invalidate a class action is antagonism as to the subject matter of the suit. Redmond v. Commerce Trust, 8 Cir., 1944, 144 F.2d 140. The subject matter of this suit is the same matter in which the beneficiaries have a community of interest—the preservation of the trust funds.

The Redmond case clearly indicates that where the preservation of a trust fund is concerned "(t)he possible situation that the beneficiaries may have divergent views as to their several undivided rights in the distribution of the trust fund * * * does not prevent this being a class action." Redmond v. Commerce Trust, supra, 144 F.2d at pages 151, 152.

■ Insofar as proportionate representation is concerned, the representation of thirty-four by one does not seem improper, particularly in view of the fact that most of the interests held by the members of the class are contingent.

■ As a factor bearing on the ability of George C. Matthies to represent the other members of the class, defendants argue that plaintiff is a "faithless" representative in that he attempted to compromise this litigation without the prior approval of this Court or notice to the other class members, in violation of Rule 23(c). They point to a letter written by plaintiff's counsel to a law partner of defendant Alcorn, offering to drop Alcorn, Hackett, Carroll, Boies, and Schiaroli as defendants if Alcorn, Hackett, Carroll, and Boies would resign as directors of the corporations involved, and along with defendant Schiaroli, sell their stock in these corporations, and if Hackett, Carroll, and Boies would resign as trustees of the trusts involved.

It cannot be stated as matter of law that this letter is determinative of plaintiff's right to represent the class. Defendants say that the letter is "blackmail"; there seems to be just as much room for the opinion that it was a first step in a good faith offer to compromise a dispute, and that if some agreement were reached, the proper notice to other members and application to the court would have followed. However ill advised and mistaken the method and wording used, if counsel in good faith considered that relief could be had through the corporation and the trust if their demands for resignations were complied with, the so-called blackmail letter is not conclusive as to the faithlessness of plaintiff as a representative party even though the suggested compromise was beyond plaintiff's power at the time.

■ This is a true class action; all members of the class will be bound by this Court's decision. Hansberry v. Lee, supra. The seriousness of the effect of any decision on the merits on the interests of all concerned has been considered; nevertheless it is felt that the community of interest here present is sufficient to allow all to be bound upon the case presented by this one plaintiff. The attack on jurisdiction over the parties must therefore fail.

## II. *Jurisdiction Over Subject Matter*

Defendants have also based their motion to dismiss upon the contention that this Court has no jurisdiction over the subject matter of this action; the claim is made that the Probate Court of the district of Derby, Connecticut has acquired and still retains a continuing *in rem* jurisdiction over the subject matter of this action which, it is asserted, relates to the administration of a testamentary trust.

The subject matter of this suit, as of any other, is based upon the nature of the relief sought. Plaintiff, in this action, seeks a variety of forms of relief: removal of trustees, appointment of a receiver, appointment of new trustees, accounting by trustees and others, injunctive relief, imposition of constructive trusts, restoration of property wrongfully transferred from trusts, and general equitable relief. For the most part, plaintiff's claims are based on the alleged improper, perhaps fraudulent administration of the trusts involved.

The Probate Court for the district of Derby, Connecticut has exercised jurisdiction over the George E. Matthies Trust since 1922 when the will of George E. Matthies was admitted to probate; likewise, jurisdiction over the Annie W. Matthies Trust has been exercised by that court since 1939, when the will of Annie W. Matthies was admitted to probate. The original trustees of these trusts have all passed away; new trustees have been appointed. In the years intervening between the deaths of the testator and testatrix, numerous accounts of the trustees, past and present, have been filed and approved by the Probate Court without any objection or appeal taken by any of the beneficiaries. Approval of the trustees' most recent account is presently pending before that court.

The question of whether this Court has jurisdiction to enter into an area which would normally be considered appropriate for litigation in the Probate Court in Connecticut is thus squarely presented here.

The jurisdiction of a United States District Court to entertain suits which concern themselves with matters involving the administration of trust estates has been a subject of lengthy, but not completely clear and harmonious discussion in the cases. Compare Commonwealth Trust Co. of Pittsburg v. Bradford, 1935, 297 U.S. 613, 56 S.Ct. 600, 80 L.Ed. 920 with Waterman v. Canal-Louisiana Bank, 1909, 215 U.S. 33, 30 S.Ct. 10, 54 L.Ed. 80; see also Kittredge v. Stevens, 1 Cir., 1942, 126 F.2d 263.

One of the leading cases on the subject is that of Princess Lida of Thurn and Taxis v. Thompson, 1939, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285, a case relied on by defendants to substantiate their claim that this Court has no jurisdiction over the subject matter. In that case, beneficiaries of a trust brought suit in the United States District Court for the Western District of Pennsylvania against the trustees of the trust, alleging mismanagement of the trust funds and praying that the trustees be removed and that they be required to account and repay any losses to the estate. Prior to the filing of this action by the beneficiaries, the trustees had filed an account in the Common Pleas Court. Thereafter, one of the beneficiaries who was also one of the plaintiffs in the federal action, filed exceptions to the approval of the account. A motion to dismiss in the federal court was refused, the court postponing decision on the jurisdictional question until answers were filed. The trustees answered. The trustees also applied to the state court for a rule upon the plaintiffs in the federal action to show cause why they should not be enjoined from prosecuting their suit in the federal court; in this proceeding the beneficiaries denied that the Common Pleas Court had jurisdiction to issue such an order; however the rule was made absolute and the beneficiaries were enjoined. Then one of the beneficiaries applied to the federal court for an injunction to restrain the trustees from further proceedings in the state court; at the same time, the beneficiaries appealed the order of the Common Pleas Court to the Supreme Court of Pennsylvania. Subsequently testimony was taken in the Common Pleas Court on the exceptions to the account taken by one of the beneficiaries. Still later, the federal court temporarily enjoined the trustees from further prosecution of the show cause proceeding which they had instituted in the state

court to prevent the beneficiaries from trying the jurisdictional issue in the federal court. That issue was then tried in the federal court. On the same day, decisions in these correlative matters were handed down by both the Supreme Court of Pennsylvania and the United States District Court. The Supreme Court of Pennsylvania affirmed the order of the Common Pleas Court enjoining the beneficiaries from prosecuting their suit in the federal court. The District Court rendered an opinion holding that it had jurisdiction notwithstanding the proceedings in the Common Pleas Court. The decision of the Supreme Court of Pennsylvania was the basis of the appeal to the Supreme Court of the United States.

The opinion of the United States Supreme Court contains the following statement of the issue involved:

"This case presents the question whether the exercise of jurisdiction by a state court over the administration of a trust deprives a federal court of jurisdiction of a later suit involving the same subject matter." 305 U.S. at page 457, 59 S.Ct. at page 277.

The answer ultimately given as to this particular case was an affirmative one; however the opinion makes quite clear that it was the law of Pennsylvania, defining the status and jurisdiction of the Common Pleas Court in probate matters, which is decisive of the issue. The Court took great pains to set out the law of Pennsylvania in its opinion. Under that law, the filing of the account with the Common Pleas Court gave that court jurisdiction over the administration of the trust; the proceedings, under Pennsylvania law, are *quasi in rem:* meaning that possession or control over the property involved is in that court and that court alone. Accepting, as it must, this declaration of purely local law coming from the Supreme Court of Pennsylvania, the Supreme Court of the United States goes on to say that the principle

which declares that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of others, is applicable to this situation and precludes any jurisdiction in the United States District Court since the Common Pleas Court first acquired jurisdiction.

"We have said that the principle applicable to both federal and state courts that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other (court), is not restricted to cases where property has been actually seized under judicial process before a second suit is instituted, but applies as well where suits are brought to marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature where, to give effect to its jurisdiction, the court must control the property. The doctrine is necessary to the harmonious cooperation of federal and state tribunals. While it has no application to a case in a federal court based upon diversity of citizenship, wherein the plaintiff seeks merely an adjudication of his right or his interest as a basis of a claim against a fund in the possession of the state court, this is not such a case. No question is presented in the federal court as to the right of any person to participate in the res or as to the quantum of his interest in it. The contentions are solely as to administration and restoration of corpus." (Footnotes omitted.) 305 U.S. at pages 466, 467, 59 S.Ct. at pages 280, 281.

█ Thus, where, under the law of a state, one of its courts is given a *quasi in rem* jurisdiction over property involved in a suit pending before it (which jurisdiction is of its very nature exclusive), "the harmonious cooperation of federal and state tribunals" requires that federal courts dismiss for lack of juris-

diction over the subject matter any suit, the subject matter of which has previously passed into the control of that state court by reason of the institution of proceedings therein. But it must be remembered that it is the law of the state wherein the two courts are situated which is determinative of the jurisdictional issue raised when such successive suits are pending.

There are a number of decisions in the lower federal courts, also relied on by defendants, which clearly demonstrate that, under Princess Lida of Thurn and Taxis v. Thompson, supra, the state law must be looked to in order to determine the nature of the state court's jurisdiction. In Swanson v. Bates, 10 Cir., 1948, 170 F.2d 648, after a trustee's account had been filed in a district court of the State of Oklahoma, and plaintiff had filed exceptions thereto and procured several continuances of a hearing on the account and exceptions, plaintiff began a suit in the United States District Court against the trustee and several others, praying for the removal of the trustee and for an accounting by the trustee, among other things. Defendants therein made a motion to dismiss on the ground that the proceedings pending in the state court gave that court exclusive jurisdiction of the subject matter, and that, therefore, the federal court could have no jurisdiction over the same. The motion was granted. On appeal, the Court of Appeals carefully examined and stated in their opinion the applicable statutes of the State of Oklahoma. They concluded:

"Upon the filing of the fourth annual report and the applications filed in connection therewith, the jurisdiction of the district court of Muskogee County attached. These proceedings were *quasi in rem*, and, so long as they pended, they gave to the state court exclusive jurisdiction over the trust estate, and the court below was without jurisdiction to grant the relief prayed for in the

instant action. (Citing Princess Lida of Thurn and Taxis v. Thompson, supra.)" 170 F.2d at page 651.

Here again state law was employed to determine the nature of the jurisdiction of the state court and it was found to be exclusive because *quasi in rem*. In West v. First Fond Du Lac National Bank, D.C.E.D.Wis.1940, 31 F.Supp. 169, 170, a similar case to those already discussed, the court carefully examined the statutory and case law of Wisconsin concerning the jurisdiction of that state's county courts in probate administration matters and then said:

"We must therefore conclude that the County Court * * * had plenary jurisdiction extending to all matters pertaining to the proper administration of the * * * (e)state, and that when the jurisdiction of said court attached, it became exclusive, and * * * no other Wisconsin court would have any jurisdiction to interfere, or to pass upon matters relating to the trust estates." 31 F.Supp. at page 170.

The Court then decided that no federal court, either had any jurisdiction to "lift out of the hands of the County Court * * * the supervision and control of a trust which was created by the terms of a will probated in that court." 31 F. Supp. at page 170, relying on the Princess Lida case, among others. To the same effect is National Bank of Topeka v. Graham, D.C.Md.1957, 156 F. Supp. 471.

These cases clearly dictate that before a federal court can assume jurisdiction of matters originally begun or presently pending in a state court, the nature of the jurisdiction of that state court must be determined; the statutes creating that court and defining its powers and jurisdiction, plus any case law in the reported decisions of the state's highest court must be examined. We turn then to an examination of the jurisdiction of the Probate Courts of Connecticut.

General Statutes of Connecticut (Rev. 1949), contain the following sections pertaining to the Probate Courts:

Section 6813. "General powers. Courts of probate in their respective districts shall have power to admit wills to probate and grant administration of intestate estates of persons who shall have died domiciled in their districts and to call executors, administrators, trustees, guardians, and conservators to account for and concerning the estates entrusted to their charge, and may make any lawful order or decrees to carry into effect the power and jurisdiction conferred upon them by the several provisions of this title * * * ".

Section 6817. "Validity of orders, judgments and decrees. Every order or decree of a court of probate * * * shall be valid unless an appeal is taken therefrom, as hereinafter specified. All proper orders, judgments and decrees of courts of probate, rendered after due notice, and from which no appeal is taken, shall be conclusive and shall be entitled to full faith, credit and validity and shall not be subject to collateral attack, except for fraud."

Section 7041. "Removal, resignation or death of fiduciary, and appointment of successor. When any executor or administrator or any other person acting in a fiduciary capacity shall become incapable of executing his trust, or neglect to perform the duties thereof, or waste the estate in his charge, the court of probate having jurisdiction may remove him, after notice and hearing, on its own motion, or upon the application and complaint of any person interested or of the surety upon his probate bond, and such court, after notice and hearing, may act upon and accept or reject the written resignation of any such person; but no such resignation shall be accepted until

such person shall have fully and finally accounted for the administration of his trust to the acceptance of such court. Upon the death, removal or acceptance of the resignation of any such person before the completion of his duties, such court of probate may appoint a suitable person to fill the vacancy caused thereby, who shall give a probate bond, and all suits in favor of or against any such person shall survive to and may be prosecuted by or against the person appointed to succeed him. Trustees appointed by a testator to execute a trust created by will and testamentary guardians may resign or be removed, and the vacancies filled in like manner by the court having jurisdiction, unless otherwise provided by the will."

Section 7051. "Jurisdiction of accounts of fiduciaries. Courts of probate shall have jurisdiction of the annual, interim and final accounts of testamentary trustees, trustees appointed by such courts of probate, conservators, guardians, persons appointed by such courts of probate to sell land of minors, executors, administrators and trustees in insolvency. Upon the allowance of any such annual, interim or final account, the court shall determine the rights of the fiduciaries rendering the account and of the parties interested therein, subject to appeal as in other cases, provided such court shall cause notice of the hearing on the same to be given in such manner and to such parties as it shall direct."

It is possible to quote other sections of the statutes relative to the powers and jurisdiction of the Probate Courts of Connecticut, but no useful purpose would be served thereby. Those quoted above have particular relevancy to the forms of relief sought by the plaintiff in this Court.

The Supreme Court of Errors of the State of Connecticut has always been of

the view that the jurisdiction of the Probate Courts of Connecticut is limited and exclusively statutory.

"In the matter of final settlement of testamentary trusts, the jurisdiction of the court of probate is not exclusive, but is concurrent with that of the ordinary courts of equity, which have always exercised such jurisdiction, which has not been taken away by the statute enlarging the jurisdiction of the court of probate, which in this regard is limited and exclusively statutory." Preston v. Preston, 1925, 102 Conn. 96, 121, 128 A. 292, 300.

In McDonald v. Hartford Trust Co., 1926, 104 Conn. 169, 190, 132 A. 902, 909, the Court, referring to claims normally cognizable in a court of equity, said:

"Whatever jurisdiction over such claims has been given by statute to the probate court is concurrent with that of our general court of equity *unless the statute has plainly expressed a contrary purpose.* Our courts of probate must find all their powers in the statute. They have no general chancery powers which are incidental to the settlement of an estate and are necessary for the adjustment of the equitable rights before the court. Vail's Appeal, 37 Conn. [185] 195. In certain cases power is given to the probate court to appoint trustees; *we have held that this does not deprive our court of equity of its general power to appoint trustees.* Similarly we pointed out in Preston v. Preston, 120 Conn. 96, 121, 128 A. 292, and DeLadson v. Crawford, 93 Conn. 402, 405, 106 A. 326, that the jurisdiction of the probate court over testamentary trusts is exclusively statutory, and very limited, and has not taken away the general jurisdiction of the court of equity." (Emphasis supplied.)

There is no language in any statute relative to the power and jurisdiction of the Connecticut Probate Courts which

"plainly expresses a * * * purpose" to deprive the courts of general jurisdiction in Connecticut of concurrent jurisdiction over matters therein placed within the power and jurisdiction of the Probate Courts.

The Supreme Court of Errors of Connecticut has been faced with a situation similar to several federal cases previously mentioned, in that proceedings were pending in a probate court when another suit involving the same subject matter was instituted in the Superior Court, the court of general jurisdiction, praying for, among other things, an accounting by the testamentary trustee who had already filed his account with the Probate Court. In Dettenborn v. Hartford National Bank & Trust Co., 1936, 121 Conn. 388, 185 A. 82, 84, the Court said:

"The plaintiff in his present complaint seeks an accounting and money damages. In so far as the prayer for an accounting is concerned, he is seeking in the superior court the very relief which the statutes make it the duty of the court of probate to afford him and the claims he makes as to breaches of trust by the trustee are such as could properly and adequately be determined in the court of probate. The jurisdiction of courts of probate to pass upon the accounts of a testamentary trustee is not however, exclusive, and courts of general jurisdiction may entertain actions against trustees for breaches of their duty, the jurisdiction of the two courts being concurrent. (Citing Preston v. Preston, and McDonald v. Hartford Trust Co., supra.)"

The Court concluded that the pendency of the same matter in another court was insufficient reason for denying a party the right to advance his claims in a manner allowed by the law, at least where the party initiating the second action did not start the first one.

"To deny to a beneficiary in such a situation as the one before us the

right to prosecute an action in the ordinary courts because of the pendency of the probate proceedings would be to deprive him of rights and advantages in the enforcement of his claim which the law intends that he should have, and, at least where he has not instituted the probate proceedings, their pendency cannot be permitted to deprive him of the right to bring an ordinary [court] action." 121 Conn. at page 394, 185 A. at page 85.

And see the related action in the Superior Court, Opinion of Mellitz, J., Matthies v. Haskell et al. No. 86837 Superior Court for New Haven County, December 24, 1957.

 Clearly then, the instant action could be maintained in the court of general jurisdiction of Connecticut, regardless of the fact that the Probate Court originally controlled the subject matter involved. Since the jurisdiction thus acquired by the Probate Court is not exclusive, there would seem to be no injury done to the "harmonious cooperation of federal and state tribunals" referred to in the Princess Lida case [305 U.S. 456, 59 S.Ct. 281] if this federal District Court declares its jurisdiction over the subject matter herein involved. The Superior Court of Connecticut could do so. In diversity of citizenship cases, this court sits as a court coordinate with the courts of the state wherein it is located. The Princess Lida decision itself recognizes the controlling influence of state law in determining the existence of exclusive or concurrent jurisdiction in the state court.

The United States District Court for the District of Massachusetts has dealt with this same problem. The opinion of Judge Ford in Kimball v. New England Trust Co., D.C.Mass.1946, 68 F.Supp. 95, a case involving issues on all fours with those herein, is certainly pertinent in the decision of this cause, and lends support to the conclusion reached. Defendants' motion to dismiss because of lack of ju-risdiction over the subject matter must be, and is, denied.

### III. *Collusive Jurisdiction*

In both Civil 7303 and 7304, defendants assert as a ground for dismissal of these actions that they have been brought collusively to confer diversity jurisdiction, in violation of 28 U.S.C.A. § 1359, and also Rule 23(b) of the Federal Rules of Civil Procedure, insofar as No. 7303, the stockholder's suit is concerned.

Inasmuch as the principles involved in the decision of such an issue are the same whether the trust action or the stockholder action be under consideration, this discussion will apply to both actions. Defendants have pointed to a great number of factors in order to substantiate their claims of collusion. Reduced to their essentials, defendants' claims are these:

(1) George Matthies, the non-resident plaintiff, has no substantial interest in this litigation;

(2) All the expenses of this litigation are being borne by Bernard Matthies, father of George, and a resident of Connecticut, who is the real party in interest here; and

(3) George Matthies does not control this litigation; rather it is controlled by Bernard, acting in his own interest and for his own reasons.

At a preliminary hearing on the issue of jurisdiction, it was established quite positively, in fact plaintiff's attorneys seemed almost willing to concede, that Bernard Matthies is paying all the expenses of this litigation just as he did in the prior state court suit which was withdrawn. It was further established, through the testimony of both George and Bernard Matthies, that Bernard paid all of George's expenses on his trips from and to his residence in California and Connecticut prior to the institution of this suit and also during the hearings. From these facts and other evidence relative to the financial status of plaintiff, it is fair to infer that these actions would

not have been brought by plaintiff unless Bernard Matthies agreed to underwrite the expenses of litigation. It also seems clear that Bernard Matthies has a very real interest in these actions, since he is a stockholder of the Seymour Manufacturing Co., the defendant corporation, and a beneficiary of both trusts. However, it cannot be said that George Matthies has no substantial interest in this litigation. Insofar as the trust action is concerned, George Matthies holds contingent interests in the corpora of the two trusts, the value of which interests must be well in excess of one million dollars. His interest as a "shareholder" in the defendant corporation is not quite so clear, since it appears that he was not a shareholder of record at all of the times of the transactions of which he complains; here the claim apparently is that George Matthies, as a beneficiary of trusts owning substantial blocks of the stock of the defendant corporation, is an "equitable" shareholder, and that such satisfies the requirement of Rule 23(b) (1), F.R.C.P. Postponing, for the moment, the question of whether the equitable rights of a beneficiary give him the status of "shareholder" as that term is used in Rule 23(b) (1), for purposes of this discussion of collusion George Matthies shall be regarded as such a shareholder, and thus as having a real interest in the suit.

 Despite the fact that plaintiff has a real, substantial interest in this litigation and its outcome, still, if certain elements are present, it is possible to find a collusive attempt to confer diversity jurisdiction on this Court. The fact that a non-resident is induced to bring suit and reimbursed for his expenses by another or others equally interested but disabled to sue is not necessarily proof of collusion. Wheeler v. City and County of Denver, 1913, 229 U.S. 342, 33 S.Ct. 842, 57 L.Ed. 1219; New Albany Waterworks v. Louisville Banking Co., 7 Cir., 1903, 122 F. 776. However, if, to these factors is added proof that the plaintiff thus induced and reimbursed is not in fact the master of the litigation, and that he has surrendered or never had control of the suit, such control reposing in another who cannot sue because of non-diversity, then a finding of collusion is warranted. Cashman v. Amador & Sacramento Canal Co., 1886, 118 U.S. 58, 6 S.Ct. 926, 30 L.Ed. 72. Control is thus the decisive factor. The Cashman case was one where collusion was found; in that case an express contract in writing was in evidence; it clearly indicated that the plaintiff, Cashman, was suing, not for his own benefit, but for the benefit of another, and furthermore, that he had expressly agreed not to compromise, dismiss or settle the suit without the permission of the real party in interest. It was obvious that Cashman had surrendered control of the suit. No such showing has been made with respect to George Matthies, plaintiff in the instant actions. The most that could be said of the testimony elicited from George and Bernard Matthies by defendants' attorneys at the hearing is that it presents a picture of cooperation in the bringing of these actions. Conceding that George and Bernard Matthies are both interested in the events complained of, still, only one of them, George, possesses the requisite characteristic of being a non-resident of this district and state. But George does not have another requisite of a practical nature, financial means to conduct extensive litigation. The mere fact that his father, Bernard, has made it possible for George to bring suit by overcoming his financial disabilities is not a sufficient basis for an inference that George has surrendered control of the actions to Bernard; nor can such an inference be made if, in addition, the fact that George was induced to bring actions he would not otherwise have brought is considered.

Defendants having failed to establish that plaintiff has surrendered control over the conduct of these actions to another incapable of maintaining them, the jurisdiction of this Court based on diversity of citizenship is not sought col-

lusively and should attach unless there is some other factor which prevents it from so attaching.

*Failure to Comply With Rule 23(b)*

In No. 7303 defendants claim that plaintiff's suit should be dismissed for failure to comply with Rule 23(b) (1) F.R.C.P. Rule 23(b) (1) requires a complaint in a secondary action by a shareholder to aver "that the plaintiff was a shareholder at the time of the transaction of which he complains". In the complaint in No. 7303, the plaintiff has alleged that he was a "beneficial and equitable shareholder" of the Seymour Manufacturing Co. at the time of each and every transaction of which he complains. Similar allegations are made as to the Seymour Corporation of Delaware. It appears that the basis for these allegations is the fact that plaintiff has been a beneficiary of both Matthies trusts during all of the times of the transactions complained of, and that these trusts hold, as part of the res of each, substantial blocks of stock of the defendant corporations, Seymour Corporation of Delaware and Seymour Manufacturing Co. which latter corporation owns all the stock of Batiscan Company. Thus we are confronted with the issue of whether an averment that the plaintiff is an "equitable and beneficial" shareholder is sufficient to satisfy the above stated requirement of Rule 23(b) (1) when the equitable ownership is predicated upon the plaintiff's status as beneficiary of a trust.

The authorities indicate that there is a considerable question as to whether Rule 23(b) (1) imposes a substantive or procedural requirement upon plaintiffs in stockholder's derivative suits brought in the federal district courts. Compare HFG Co. v. Pioneer Publishing Co., 7 Cir., 1947, 162 F.2d 536 (procedural), and Gallup v. Caldwell, 3 Cir., 1941, 120 F.2d 90 (substantive); cf. 3 Moore's Federal Practice, Sec. 23.15, pp. 3496–3502; 2 Barron & Holtzoff, Federal Practice & Procedure, Sec. 566, pp. 165–

166; Comment, 25 Va.L.Rev. 100 (1938); Comment, 46 Mich.L.Rev. 431 (1948). The specific problem in this case can be narrowed down to whether the term "shareholder" as used in Rule 23(b) (1) embraces a beneficiary of a trust, part of the res of which is stock of the corporation involved. If the determination of the scope of the term "shareholder" as it is understood in Rule 23(b) (1) is a substantive question, then, under Erie Railroad v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, this Court in making that determination must look to the laws of the states of Connecticut and Delaware for guidance. If the question is procedural only, then federal general law is the authoritative source of guiding principles.

In the view we take of the problem involved in this particular case, the question of substance v. procedure need not be decided. Counsel for both sides have not been able to produce any Connecticut decisions as to the qualifications a person must possess to be a "shareholder" capable of bringing a stockholder's derivative suit; our own research has likewise failed to disclose the existence of any Connecticut law bearing on the equitable ownership issue. In a case where jurisdiction is based upon diversity of citizenship, the absence of any controlling decisions of the state courts compels this Court, sitting as a court of the state, to resort to generally applicable principles, i. e., those rules supported by the current of authority, including federal authorities. Murdock v. Follansbee Steel Corp., 3 Cir., 1954, 213 F.2d 570; Continental Assurance Co. v. Conroy, 3 Cir., 1954, 209 F.2d 539; Steinberg v. Hardy, D.C.Conn. 1950, 90 F.Supp. 167; Seaboard Mutual Casualty Co. v. Profit, 4 Cir., 1940, 108 F. 2d 597, 126 A.L.R. 1105. Thus, whether the requirement of the rule be substantive or procedural, in this case the Court is constrained to refer to general, common law principles to provide the basis for its decision insofar as the Seymour Manufacturing Co., a Connecticut corpo-

ration is concerned. We now turn to an examination of those principles.

Several states have passed laws similar in language to Rule 23(b) (1). New York has adopted this rule in its General Corporation Law, McKinney's Consol. Laws, c. 23, § 61. In various decisions, New York has classified certain individuals as "equitable owners" and qualified them as "shareholders" within the meaning of the New York statute. Those allowed to sue have been persons whose stock is held in the name of a nominee or broker, Croen v. Gottlieb, 1957, 8 Misc. 2d 628, 166 N.Y.S.2d 278, those whose stock is held in a voting trust, Koppel v. Middle States Petroleum Corp., 197 Misc. 479, 96 N.Y.S.2d 38, and those who have become equitably entitled to a transfer of stock by virtue of a settlement agreement with the executor of an estate who holds legal title thereto, Law v. Alexander Smith & Sons Carpet Co., 1947, 271 App. Div. 705, 68 N.Y.S.2d 143. Furthermore, there are cases reported in the New York decisions which indicate that a beneficiary of a trust is to be considered an equitable owner for purposes of derivative suits. Braman v. Westaway, Sup., 60 N.Y.S.2d 190, relying on Baum v. Sporborg, 146 App.Div. 537, 131 N.Y.S. 267. Though never expressly overruled, the value of these latter decisions as expressive of the present New York view has been considerably weakened by the decision in Miller v. Miller, 256 App.Div. 846, 9 N.Y.S.2d 448, affirmed 280 N.Y. 716, 21 N.E.2d 212; this is particularly so since a dissent was registered in the Appellate Division in the Miller case which was a suit by a legatee and beneficiary under a will who claimed to be an equitable shareholder; the dissent cited Baum v. Sporborg as authority for allowing the suit, but the Court of Appeals affirmed dismissal without even rendering an opinion.

As a result of these decisions it might be said that the law of New York, a pioneer state in enacting this type of legislation, is somewhat inconclusive on the point of whether a beneficiary of a trust can maintain a derivative suit.

Delaware has also passed a similar statute. Title 8, Delaware Code, § 327 (formerly, General Corporation Law, Sec. 51A). It has been held that one who purchased stock of a corporation but left street certificates representing the stock standing in the names of his brokers was an equitable owner and a "stockholder" within the meaning of the Delaware statute, and entitled to bring a derivative suit. Rosenthal v. Burry Biscuit Co., 1948, 30 Del.Ch. 299, 60 A.2d 106. This seems to be in conformity with the statement by Moore of the so-called majority state rule. See 3 Moore's Federal Practice, 2d Ed. Sec. 23.17, p. 3517, and footnote 3 therein. However, while these are all indications that "equitable owners" may bring such suits according to the current of authority, defendants state that plaintiff is not an "equitable owner" but merely an "owner of an equitable interest". Defendants obviously regard this characterization as requiring plaintiff to be placed outside the operation of the majority rule. Passing the question of whether the characterization is accurate or even appropriate, the essential question still remains: should one in plaintiff's position be placed outside the majority rule that mere equitable ownership, as opposed to ownership of record, is sufficient to give one the status of "shareholder" as that term is used in rules and statutes governing derivative suits?

The answer must be in the negative. To allow an overly strict interpretation of Rule 23(b) (1) to defeat the equitable rights claimed by plaintiff in this suit would seem to be contrary to the liberal purposes of the Federal Rules and to generally accepted equitable principles. Assuming for purposes of this motion to dismiss that the matters alleged by plaintiff are true, dismissal of plaintiff's suit on the basis that Rule 23 (b) (1) prevents the suit will leave him remediless in this federal court where

he has a right to be heard because of the diversity of citizenship involved. Under such a narrow interpretation of Rule 23(b) (1), the Matthies trustees would be the only logical plaintiffs, yet they are defendants in this suit which alleges that they participated in the wrongs of which plaintiff complains. Nor can the Court shut out of its view in this case the fact that in the companion case, No. 7304, these defendants, who are officers and directors of the corporations involved, are being sued in the capacity as trustees of the Matthies Trusts. The two suits are *in pari materia*. It is obvious that the trustee-directors would not bring suit against themselves. To meet just such a situation in one area of the law, the principles governing the running of corporations, equity devised the stockholder's derivative suit, a device designed to cope with the fact that the erring parties were the very ones charged with the responsibility of bringing suit. Dodge v. Woolsey, 1855, 18 How. 331, 15 L.Ed. 401; and see the discussion of the evolution of this type of action in Hawes v. City of Oakland, 1881, 104 U.S. 450, 452–460, 26 L.Ed. 827. The situation complained of in this suit goes somewhat beyond the facts that usually give a basis for a derivative suit, but assuming the truth of the allegations, the device of a stockholder's suit seems to be the only means of providing an adequate remedy in this Court. If the facts alleged are true, the corporations involved have a cause of action. If the directors of the corporations won't assert them, normally the stockholders would. Here some of the stockholders either refuse to sue or cannot sue in the federal court, and the trustees, as stockholders, will not sue because each has an *alter-ego*, a role as director of the involved corporations. Should the trust beneficiaries be powerless to act in this situation? Equity will protect the beneficiaries of trusts when those charged with the duty of protecting their interests become derelict. In 4 Bogert, Trusts & Trustees, Sec. 870, pp. 460, 461, after discussing the well-known rule that normally the trustee sues for wrongs done to trust property, the author states:

"If the trustee cannot or will not enforce the cause of action running to him for the benefit of the cestui, a practical difficulty arises which compels the courts to vary their usual rules as to parties. There is a danger that the cause of action may be barred by laches or the operation of the statute of limitations, if the cestui is obliged to wait for the trustee to act or is forced to sue the trustee to compel action, or to bring a proceeding for the removal of the trustee and the appointment of a successor. In addition the financial condition of the third party may change so that all relief will be shut off. In the emergency, the court permits a suit in equity by the cestui to enforce the cause of action running to the trustee in which the third party and the trustee should be made parties defendant. The cestui is not enforcing his own cause of action, but is acting as a temporary representative of the trust in order to effect a recovery which will go to the trustee or his successor for the benefit of the cestui."

Defendants rely on Butler v. Sisson, 1882, 49 Conn. 580 as demonstrating that, under Connecticut law, the refusal of a fiduciary to bring an action does not give a beneficiary of a trust or estate standing in equity to sue derivatively on the claim in favor of the estate. The holding in that case was far from announcing such a sweeping principle. The decision may be said to be within the familiar doctrine that equitable relief will be denied a party who has a plain, simple, and adequate remedy at law. The petitioners there were parties interested in an estate who sought an order requiring certain property to be turned over to the administrator of an estate, the administrator having previously refused to bring suit. The Court

denied the relief sought by sustaining a demurrer to the bill, on the basis that an adequate remedy or remedies were available to petitioners in the Probate Court; the Court also alluded to the possibility of a suit at law for damages should the administrator's neglect result in the loss of the property to the estate. But the Supreme Court of Errors went on to say:

"We do not intend to say that the doors of a court of equity are absolutely closed against all parties situated as these petitioners are. They may present a case of impending irreparable injury * * *. But no such emergency is presented here." 49 Conn. at pages 589, 590.

These closing words of the Court certainly indicate that there may be circumstances in which the Connecticut courts will find it appropriate to apply the rule set out above from Bogert's work.

Why should not the rationale of this rule be applied to this situation when that is the only practical, effective way in which plaintiff's interests can be protected? The only reason for not applying it would be an interpretation of the term "shareholder" which included "equitable owners" but excluded "owners of equitable interests" in shares of stock. Such an interpretation is without merit in the view of this Court.

In Hurt v. Cotton States Fertilizer Co., 5 Cir., 1944, 145 F.2d 293, the court was faced with a problem quite similar to the one presented here. Plaintiff there was a residuary legatee under his father's will; part of the residue of the father's estate was stock of the defendant corporation. The claim was made there that under Rule 23(b) (1) and a similar Georgia statute, plaintiff could not maintain the suit because not a shareholder at the times of the transactions complained of; however, it appeared that although legal title was in the executor, plaintiff's equitable rights as legatee had vested in him prior to the times of the various transactions. Without considering the

substance vs. procedure issue since it felt (as this Court does here) that the outcome would not be affected by such a decision, the court stated the main issue for decision as follows:

"* * * we have to consider whether or not one must have the *legal* title to shares of stock in the corporation at the time of the transaction complained of or *whether the owner of an * * * equitable interest* in such stock might not also resort to the Court for the protection of that title or interest from depredation by the corporate management." (Emphasis supplied.) 145 F.2d at page 295.

The answer and its rationale followed:

"We think the question must be answered in the affirmative. The executor under the will, having the right to sell stock to pay the debts of the estate, had the legal title thereto, nevertheless he was a trustee of the legal title with the beneficial, or equitable, title in the legatees, charged with the liability for payment of debts of the testator and expenses of administration. Since equity regards substance rather than form, the equitable title, in the absence of intervening rights of third parties, is superior to the naked legal title. In equity, therefore, the owner of the equitable title to shares of stock is a stockholder in a fuller sense than is the owner of the naked legal title. Assuredly it is not the purpose of the * * * rule (Rule 23(b) (1)) to afford the holder of the naked legal title to shares of stock a right of action and to deny the holder of a higher right, the equitable right, such a privilege. The protection of the law would hardly be denied to the owner of the substance, meanwhile being accorded to the holder of the shadow. We do not believe that it was the purpose of * * * the rule * * * to deny the process of the Court to

the owner of an equitable right, title, or interest in stock, regardless of whether the right be vested or contingent \* \* \*.

"We conclude, therefore, that an owner of the equitable title, or an equitable interest in the title, to shares of stock is not prevented by \* \* \* the Federal Rules from maintaining a suit which seeks to protect stock in which he has such an ownership or interest from impairment or loss." 145 F.2d at page 295.

The case is particularly significant here because of the fact that the Court dealt specifically with the rights of "owners of equitable interests", not just "equitable owners". In our view, the reasoning of the Court therein meets fully and necessitates the rejection of defendants' contention that an "owner of an equitable interest" in stock cannot avail himself of the protection of a stockholder's derivative suit.

Other factors can be brought forth to demonstrate the feasibility of allowing a person in plaintiff's position to bring a suit of this type.

"An individual stockholder of a corporation which is a holding company holding stock of operating corporations may maintain a derivative action for the benefit of the operating corporations, joining them as parties, on the theory that the holding company could sue derivatively on behalf of the subsidiaries and that on failure of the holding company to act, plaintiff, its stockholder, may sue. There is nothing in Rule 23(b) to justify a contrary conclusion. Such a suit is known as a 'double derivative' action." 3 Moore's Federal Practice, Sec. 23.-17, p. 3519.

Thus a person once removed from the defendant corporation has been allowed to assert the corporation's cause of action because equity and justice require it.

"The justification for allowing a double derivative suit \* \* \* to be maintained is that both the original corporation that is said to have suffered wrong and its shareholder corporation which had the right to bring a derivative suit were in the control of those charged with inflicting the corporate injury." United States Lines v. United States Lines Co., 2 Cir., 1938, 96 F.2d 148, 151.

Should it make a difference that a trustee is the entity holding the stock of the corporation whose cause of action is sought to be asserted by the once-removed party, rather than a holding company? Or that the once-removed party is the beneficiary of a trust rather than the stockholder of a holding company?

In Goldstein v. Groesbeck, 2 Cir., 1944, 142 F.2d 422, 154 A.L.R. 1285, the Court of Appeals said:

"A shareholder's suit in essence is nothing more than a suit by a beneficiary of a fiduciary to enforce a right running to the fiduciary as such; a double derivative suit is one in which the beneficiary is in his turn a fiduciary, and as such refuses to enforce the right which is his as beneficiary of the first fiduciary." 142 F.2d at page 425.

This explanation cuts through forms and gets at the substance of the equitable principles which justify double derivative suits. But this very same language fits the case presently before the Court. It should make no difference that two corporations are involved in the double derivative suit and a corporation and a trust involved herein; both situations can be reduced to their simplest terms in the language quoted above from the Groesbeck case. Equity should protect the beneficiary of a trust which in turn is the beneficiary of a corporation on the same terms as it protects the beneficiary of a corporation which is in turn the beneficiary of a corporation.

■ This Court then is of the opinion that, as principles of general, common law, and equity demonstrate (the law of Connecticut not having been shown to be to the contrary, if it be material), plaintiff has the right, under Rule 23(b) (1), F.R.C.P., to maintain this secondary action against the Seymour Manufacturing Company.

Two Delaware corporations are also named as defendants by plaintiff. They are the Seymour Corporation of Delaware, and Batiscan Company. Apparently all of the stock of Seymour Corporation of Delaware is held in the George E. Matthies Trust; this corporation was dissolved in 1950, its assets being transferred to the Matthies trustees. Batiscan Company is a wholly owned subsidiary of Seymour Manufacturing Co.; it was dissolved in 1957 and its assets distributed to Seymour Manufacturing Co. In determining who is qualified to bring a derivative suit against a Delaware corporation, a Connecticut court would doubtless look to the law of Delaware, the state of incorporation. Steinberg v. Hardy, D.C.Conn.1950, 90 F.Supp. 167, 169 citing Connecticut cases. So must this Court, if, as has been said, the question presented here is one of substantive law. But here also we find it unnecessary to decide the issue of substance vs. procedure because of the state of the applicable local law.

It has previously been indicated that Delaware allows an equitable owner to bring a derivative suit as a "shareholder" within the meaning of its statute when his equitable rights are in stock, the legal title to which is represented by street certificates standing in the names of brokers. Rosenthal v. Burry Biscuit Co., supra. No Delaware case dealing with a suit by a beneficiary of a trust asserting a corporate cause of action derivatively has been brought to the Court's attention nor has our own research brought any to light. In this state of affairs we must resort to general principles as we did in dealing with

the law of Connecticut. So again, whether the question be substantive or procedural, the source of principles of decision here is the same—the general current of authority as seen in the reported cases, state and federal. That which has been said already regarding the probable law of Connecticut applies with equal if not greater vigor to the law of Delaware, in view of the fact that the Rosenthal case indicates a solicitude on the part of Delaware for the rights of persons whose interest in stock is equitable only. We therefore conclude that plaintiff is a "shareholder" within the meaning of Rule 23(b) (1) whether the law of Connecticut, or of Delaware, or federal law be deemed controlling in arriving at a decision.

Batiscan is wholly owned by Seymour Manufacturing Co. As to it then, this is a "double derivative" suit. Such suits are not contrary to the purpose and intendment of Rule 23(b) (1) and have been permitted in the federal courts. Craftsmen Finance & Mortgage Co. v. Brown, D.C.S.D.N.Y.1945, 64 F.Supp. 168; Goldstein v. Groesbeck, supra; United States Lines v. United States Lines Co., supra. Nor, in view of our discussion of the state of the law of Connecticut and Delaware, is there any need to decide whether the law of the state or incorporation of the holding corporation or of the state of incorporation of the subsidiary corporation should control.

■ But, defendants claim, plaintiff's equitable interest here is joint as to any particular piece of trust property such as a share of stock, therefore all other beneficiaries must be joined with him as indispensable parties.

This is an action under Rule 23. That rule permits "such * * * one or more" of the persons constituting a class "as will fairly insure the adequate representation of all" to sue "on behalf of all * * * when the character of the right sought to be enforced for or against the class is (1) * * * secondary * *".

Section (b) of Rule 23 goes on to establish further requisites for the maintenance of a secondary action by a shareholder representing a class of shareholders. Plaintiff has met these latter requisites in our opinion. Much has already been said to demonstrate that plaintiff also satisfies the requirements of Section (a) of Rule 23, i. e., that plaintiff will adequately represent the interests of all the members of a class so numerous as to make it impracticable to bring them all before the Court. It is a necessary consequence of our holding that every person beneficially interested in the Matthies Trusts, who is represented by plaintiff in No. 7404, the trust action, is also an equitable and beneficial shareholder of the corporations involved in No. 7303, the secondary action, due to the ownership of stock of those corporations by the Matthies Trusts. Plaintiff, having been shown to be an adequate representative in the trust action, must then also be an adequate representative of all the equitable and beneficial shareholders in the secondary action. It would be anomalous to hold that he can represent all other beneficiaries of those trusts for purposes of suit against the trustees and others, but that for purposes of a shareholder's suit, the right to which is derived from ownership of an equitable interest in stock held by those same trusts and is merely another aspect of their position as beneficiaries, he cannot represent them. Rule 23 does not require such a result. Accordingly, this claim of defendants must be rejected.

Defendants' motion to dismiss for failure to comply with Rule 23(b) (1) is denied.

*Memorandum Re Seymour Delaware*

█ In the brief of defendants Hackett, Carroll, Boies, and Schiaroli, who are being sued individually and in their capacity as liquidating trustees of the Seymour Corporation of Delaware, counsel have raised the question of the availability of a shareholder's suit against the Seymour Corporation of Delaware under existing Delaware law. The question arises because of the fact that the corporation, hereafter called Seymour, has been dissolved for some eight years.

Title 8, Delaware Code, § 278 provides:

"All corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of three years from such expiration or dissolution, bodies corporate for the purpose of prosecuting and defending suits by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property and to divide their capital stock, but not for the purpose of continuing the business for which the corporation shall have been established. With respect to any action, suit, or proceeding begun or commenced by or against the corporation prior to the expiration or dissolution and with respect to any action, suit or proceeding begun or commenced by or against the corporation within three yars after the date of the expiration or dissolution, the corporation shall, only for the purpose of such actions, suits or proceedings so begun or commenced, be continued bodies corporate beyond the three-year period and until any judgments, orders, or decrees therein shall be fully executed."

Defendants claim that the effect of this statute is to bar any suit against Seymour which was dissolved in 1950, since a suit brought any time after 1953 comes within the three year limitation thus announced. Plaintiff's counsel, however, point to the statute which immediately follows the one just quoted, 8 Delaware Code, § 279, as providing a basis for the maintenance of a suit more than three years after dissolution.

Section 279 provides:

"When any corporation organized under this chapter shall be dissolved in any manner whatever, the

Court of Chancery, on application of any creditor or stockholder of the corporation, at any time, may either appoint one or more of the directors thereof trustees, or appoint one or more persons to be receivers, of and for the corporations, to take charge of the estate and effects thereof, and to collect the debts and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation, or otherwise, all such suits as may be necessary for the purposes aforesaid, and to appoint an agent or agents under them, and to do all other acts which might be done by the corporation, if in being, that may be necessary for the final settlement of the unfinished business of the corporation. The powers of the trustees or receivers may be continued as long as the Court of Chancery shall think necessary for the purposes aforesaid."

The issue thus presented would seem to be whether or not Section 278 prevents a shareholder's derivative suit from being brought more than three years after dissolution and, if it has that effect, whether Section 279 provides an exception to its operation.

A literal reading of both statutes indicates that a stockholder's suit brought for the purpose of asserting a corporate cause of action, i. e., a derivative suit, would be barred if brought more than three years after the date of dissolution.

"In legal effect, a stockholder's suit is one by the corporation conducted by the stockholder as its representative. The stockholder is only a nominal plaintiff, the corporation being the real party in interest." 13 Fletcher, Cyclopedia Corporations, Sec. 5339, p. 295.

Furthermore, it is generally held that the corporation is an indispensable party to such litigation. 18 C.J.S. Corporations § 570(b), p. 1293.

Since a dissolved corporation could not prosecute any cause of action which it had or defend one against it once the statutory three year period had run (its dissolution being the very factor which disables it from suing or defending) it is difficult to understand how a stockholder could bring such a suit since a stockholder's rights are derived from such rights as the corporation may have. The policy of the statute is that of mitigating the rule of the common law that dissolution of a corporation terminates its capacity to sue and be sued. 13 Fletcher, Cyclopedia Corporations, Sec. 8143. Were it not for the statute a dissolved corporation could not assert, in the courts, any claim of injury to it against its officers, directors, or third persons. The statute inhibits this disability for a three year period, no more. Once the three years have passed the corporation no longer has a justiciable cause of action as a corporation. The corporation having no cause of action to assert, the stockholder can have no cause of action to assert.

Section 279, relied on by plaintiff, does not authorize suits by a stockholder as a representative of the corporation. It grants to stockholders or creditors the right to apply, at any time, for the appointment of directors as trustees or some other persons as receivers of the corporation; such trustees or receivers, if appointed, will have certain enumerated powers, among them the power to sue to collect property belonging to the corporation. But notice that the power of instituting suit is given to the court-appointed officials, not to the stockholder or creditor.

Therefore it seems that under the law of Delaware, which a Connecticut court would probably follow, the Seymour Corporation of Delaware cannot be made a party defendant in a shareholder's derivative suit, having lost the capacity to do so as a result of its dissolution and the running of the three year period allowed by Section 278.

The motion to dismiss as to Seymour Corporation of Delaware in No. 7303 is granted. However, it may be noted that the liquidating trustees of that corporation will remain in the case as parties defendant, and may be accountable for any breaches of their duty to the shareholders in the process of dissolution.

### Unclean Hands

In both Nos. 7303 and 7304, the claim is advanced by defendants that plaintiff has "unclean hands" and should be denied access to the equitable processes of this Court. Defendants support their argument by advancing three propositions:

(1) that the institution of these actions by plaintiff was motivated by malice on the part of plaintiff and one of his attorneys, Hodgson, against the defendants, particularly defendant Alcorn;

(2) that plaintiff, through his attorneys, offered to secretly compromise these suits in violation of Rule 23(c);

(3) that plaintiff, as one of a group of plaintiffs in a prior Superior Court suit, violated an agreement to go to trial in that court by withdrawing the action there.

The usual case of unclean hands is one where the plaintiff has, in some fashion, participated in the wrongdoing of which he later complains, and is precluded from relief because of the taint thus acquired.

"The dirt upon his hands must be his bad conduct in the transaction complained of. If he is not guilty of inequitable conduct toward the defendant in that transaction, his hands are as clean as the Court can require." Pomeroy's Equity Jurisprudence, Sec. 399, p. 97.

The three matters referred to by defendants are not an intrinsic part of the various transactions complained of by plaintiff in the two complaints herein; they are connected with the institution of and the conduct of the two suits rather than the events which led up to and gave rise to the causes of action.

If Pomeroy's statement of the doctrine were to be accepted, defendants would have to show that plaintiff, in some manner connected with the transactions involving the trusts and corporations of which he complains, was guilty of inequitable conduct himself. But such is not the thrust of defendants' charges. As has been said, defendants complain of alleged inequitable conduct in the maintenance of this and prior litigation.

However, a prospective litigant must do more than keep his hands clean up to the time he brings suit; he must keep them that way. In Root Refining Co. v. Universal Oil Products Co., 3 Cir., 1948, 169 F.2d 514, it was said:

"No principle is better settled than the maxim that he who comes into equity must come with clean hands and keep them clean throughout the course of the litigation, and that if he violates this rule, he must be denied all relief whatever may have been the merits of his claim. (Citing cases)." 169 F.2d at pages 534, 535.

Thus it seems that plaintiff must not only have refrained from inequitable conduct during the course of the transactions complained of, but also during the time of the trial as well. The Root case, and those cited as precedent therein for the statement from that case quoted above, demonstrate the type of conduct which has moved a Court to deny relief to a plaintiff on the ground that he failed to keep his hands clean throughout the litigation. In the Root case, the conduct attributed to plaintiff was bribery of a federal circuit court judge in order to secure a favorable decision on appeal. In Hazel-Atlas Co. v. Hartford Co., 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, the plaintiff perpetrated a fraud on the Patent Office and a Circuit Court of Appeals so as to secure a favorable decision in a patent case. In Keystone Driller Co. v. General Excavation Co., 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293, plaintiff effected a corrupt

bargain to suppress evidence damaging to a patent in one case; a favorable decree in that case was asserted to provide a basis for new infringement suits; defendants, in these later suits, were entitled to show plaintiff's unclean hands arising out of the prior suit to defeat plaintiff's claims. Mas v. Coca-Cola Co., 4 Cir., 1947, 163 F.2d 505, was a case where the plaintiff's inequitable conduct consisted of introducing forged and false documents in a patent hearing prior to a suit by plaintiff on the patent. In American Insurance Co. v. Scheufler, 8 Cir., 1942, 129 F.2d 143, plaintiffs perpetrated a fraud upon a district court in order to obtain a favorable decree.

It can be seen from these decisions that where the inequitable conduct does not arise out of the transaction complained of, but arises in connection with the litigation, the conduct must be such as to amount to a fraud upon the Court or to employ the Court's process to perpetrate a fraud or injustice on another.

The three elements advanced by defendants as constituting inequitable conduct do not present a picture of fraud upon this Court or abuse of the process of this Court in order to perpetrate a fraud or injustice on another.

*Malice.* Although malice is an important element in cases involving vexatious suits, Calvo v. Bartolotta, 1930, 112 Conn. 396, 152 A. 311; Schaefer v. O. K. Tool Co., Inc., 1930, 110 Conn. 528, 148 A. 330, the fact that ill will exists between the parties to a lawsuit does not appear to be, of itself, inequitable conduct, particularly where there is probable cause for the bringing of suit. The element of malice entered the record in this case because defendants sought to restrain plaintiff from proceeding with these suits on the ground that they were vexatious suits. During the hearing on defendants' motion for injunction, plaintiff, for purposes of the motion only, conceded *arguendo* the existence of malice, thus leaving probable cause as the only issue on which it was necessary to hear proof. Defendants failed to show lack of probable cause and their motion for injunction was denied on July 3, 1958. The Court is unable to hold that plaintiff has admitted malice for every and all purposes in these suits.

*The Compromise Letter.* On the day after the complaints in these actions were filed in this Court, two of plaintiff's attorneys, Gaffney and Hodgson, wrote to the law partner of defendant Alcorn, offering to compromise these suits as to defendants Alcorn, Hackett, Boies, Carroll, and Schiaroli, if certain "minimum conditions" were met. The basic proposition advanced was an offer to drop Alcorn, Hackett, Boies, Carroll, and Schiaroli as defendants in these actions if Alcorn would resign as a director of the Seymour Manufacturing Company, sell his stock in that corporation, and secure the resignations of Hackett, Boies, and Carroll as trustees of the Matthies Trusts and directors of Seymour Manufacturing, along with the sale of their stock and also that of Schiaroli's. At the time this offer was made, the complaints herein had not been made public; one of the apparent inducements offered in the letter was the fact that acceptance of the compromise would result in amendment of the complaints so that Alcorn, Hackett, Boies, Carroll and Schiaroli, all men of considerable standing in the community, would never be publicly named as defendants. Defendants claim that this is blackmail, or, at the very least, that it is a secret attempt to compromise an action in violation of Rule 23(c). Apparently the offer not to make the complaints public is the "secret" aspect, in the view of defendants. Although one might entertain strong doubts as to the wisdom of sending such a letter at any time, it cannot be said that this letter was an attempt at blackmail, or, although definitely an *offer* to compromise, a violation of Rule 23(c). Our courts look with favor on out-of-

court settlements of disputes. On its face, this letter is nothing more than offer to settle with some of the defendants in these actions. But defendants claim that certain events which took place prior to the sending of this letter, namely, two meetings between plaintiff's attorney, Hodgson, and Alcorn, and matters that transpired therein, throw a light on the purpose of the letter and show that purpose to be blackmail. The testimony of Alcorn and an affidavit of Alcorn's partner, H. Graeme Smith, are to the effect that Hodgson threatened to "ruin Alcorn nationally" unless he yielded to certain demands of parties that he (Hodgson) represented. Hodgson, by counter-affidavit, says no such threats were ever made. Such contradictory evidence is, in our view, an insufficient basis for turning a letter, the plain language of which expresses nothing more than an offer to compromise, into a threat of injury unless certain demands are met. The Court has already found the existence of probable cause as to the merits of these suits. This must necessarily count heavily against the possibility that the suits may have been brought for some ulterior purpose. The existence of probable cause is a factor which this Court considers to be as pertinent to the issue of the purpose of this letter as, doubtless, the defendants consider the background information that they have put forth. If this letter were an attempt at blackmail, it would be evidence of the type of conduct which would require the Court to hold a plaintiff remediless on the ground that he failed to keep his hands clean throughout the litigation. But we hold that it is not established that the letter was an attempt at blackmail. It sought, primarily, the removal of the defendants concerned from their positions as directors and trustees. This was one of the main purposes of the suits themselves, not an ulterior purpose. The fact that the letter offered defendants little in return for what they were asked to do might make it a poor offer, but not necessarily a blackmail threat.

■ An offer to compromise is not a "compromise"; only the latter requires the approval of the Court, as we read Rule 23(c). There is nothing in the plain language or the spirit of Rule 23(c) which requires the approval of the Court before a plaintiff in a class action may *initiate* an attempt at settlement or compromise. Insofar as notice to the other members of the class in a true class suit is concerned, the Rule speaks of a "proposed dismissal or compromise". The existence of a concrete compromise agreement or basis for dismissal, determined in advance and submitted to the Court for approval would seem to be implicit in the notion of such a proposal. This Court, in fairness to plaintiff, is not free to assume that any proposed compromise would not have been brought before it for approval, and that notice would not have been sent to other members of the class which plaintiff represents as required, in No. 7304, the true class action. Defendants have failed to show that plaintiff intended in no way to comply with the requirements of the Rule. No violation of Rule 23(c) is apparent on this record.

*Withdrawal of State Court Action.* The action in question was commenced in the Superior Court for New Haven County on November 20, 1957 by six plaintiffs, including George C. Matthies, the plaintiff here. On April 24, 1958, after many delays caused by both sides, the parties stipulated that trial on the merits would proceed on May 27, 1958. On that day the case was declared on trial, but continued for one week at plaintiff's request. On June 2, 1958, the plaintiffs there withdrew their action. On the same day the complaints in the instant actions were filed with the Clerk of this Court at New Haven. Defendants sought to have the state action restored to the docket of the Superior Court by means of a motion to strike the withdrawal of the action, or, in the alternative, to restore the action to the docket. The presiding judge, on June 17, 1958, filed a

Memorandum of Decision denying defendants' motion in which it was stated that the plaintiffs there had an absolute legal right under Connecticut law to withdraw the suit since it had not yet proceeded to the stage of a hearing on the merits where fact issues were to be tried. See General Statutes of Connecticut (Rev.1949), Section 7801.

This Court is unable to see how the exercise of a right which under the applicable law is absolute can be regarded as such inequitable conduct towards defendants as to make it an affront to the dignity of this Court to allow plaintiff to begin his suits here. There is an indication that all six plaintiffs in the state action could have moved to have their suit restored to the docket in the Superior Court and that that Court would have jurisdiction to do so, if it was so disposed. Lusus v. Saint Patrick's Roman Catholic Church Corp. of Waterbury, Conn., 1937, 123 Conn. 166, 193 A. 204, 111 A.L.R. 763. If those plaintiffs could do that in the state court, what is the inequity in allowing one of them to bring suit here? Certainly the stipulation of April 24, 1958, to go forward with the trial on May 27, 1958, was not a waiver of plaintiffs' right to withdraw. Defendants make no such claim. Short of such, the withdrawal and later commencement of these suits here was not such inequitable conduct as to bar plaintiff from this Court.

The Court finds no substance in defendants' argument that plaintiff should be denied access to its equitable processes because of unclean hands.

### Conclusion

Every issue raised by defendants in this proceeding has been, in their view, part of what might be called an omnibus contention that the institution of these actions constitutes an abuse of federal process since they were instituted with malice and without probable cause that this federal court had jurisdiction. Defendants also contend that, as an incident of this proceeding, the Court should dismiss irrespective of abuse of federal process, since federal jurisdiction is lacking.

All that has been said prior to this indicates that in the view of this Court there is federal jurisdiction present for both of these actions. Therefore, no dismissal for lack of federal jurisdiction is required.

In addition, our conclusion that federal jurisdiction actually exists, defeats defendants' abuse of process contention because, obviously, jurisdiction having been shown to exist, it cannot be said that the suits were instituted without "probable cause" that this Court has jurisdiction. Of course, rejection in the main of the motions to dismiss carries no implication that plaintiff will succeed on any or all of the factual issues on the merits of either or both cases, but merely that his claims are such as lie within the jurisdiction of this Court for determination.

Motion to dismiss granted solely as to Seymour Corporation of Delaware, denied in all other respects.

### Appendix A.

I. The principal dispositive provisions of the will of George E. Matthies are as follows:

"Fifth: I direct my executors and trustees herein named to divide all the rest, residue and remainder of my estate into nine equal shares or parts and to hold, manage, and administer and dispose of the same in the manner hereinafter set forth, viz:

"1. As to three of said equal ninth shares or parts, I give, devise, and bequeath the same to my said executors and trustees hereinafter named In Trust Nevertheless for the uses and purposes following:

"(a) To invest and keep the same invested and to pay the net income therefrom to my wife Annie W. Matthies, for and during her life.

"(b) After the death of my said wife to pay the net income from two of said equal ninth parts or shares to my daughter Katherine for and during her life, and upon the death of my said daughter to pay, transfer and set over the principal of said two equal ninth parts or shares to her lineal descendants equally per stirpes and not per capita.

"If my said daughter shall leave no lineal descendants, to pay, transfer and set over the principal of said two equal ninth parts or shares to my son Bernard or if he shall not be living at that time to pay, transfer and set over the same to his lineal descendants equally per stirpes and not per capita.

"(c) Upon the death of my said wife to pay, transfer and set over the principal of one of said equal ninth parts or shares to my son Bernard, or if he shall not be living at that time to pay, transfer and set over the same to his lineal descendants equally per stirpes and not per capita.

"If my said son Bernard shall not then be living and shall leave no lineal descendants then surviving, to pay the net income from said one-ninth part or share to my daughter Katherine for and during her life and upon her decease to pay, transfer and set over the principal thereof to the lineal descendants of my said daughter Katherine equally per stirpes and not per capita.

"2. As to two of said equal ninth parts or shares, I give, devise and bequeath the same to my executors and trustees hereinafter named In Trust Nevertheless for the purposes and uses following:

"(a) To invest and keep the same invested and to pay the net income therefrom to my son Bernard for and during his life.

"(b) On the death of my said son to pay, transfer and set over the principal of said fund to the lineal descendants of my said son equally per stirpes and not per capita.

"(c) If my said son shall leave no lineal descendants, to pay the net income therefrom to my daughter Katherine for and during her life, and upon her death to pay, transfer and set over the principal of said fund to the lineal descendants of my said daughter equally per stirpes and not per capita.

"3. As to four of said equal ninth parts or shares, I give, devise and bequeath the same to my executors and trustees hereinafter named In Trust Nevertheless for the uses and purposes following:

"(a) To invest and to keep the same invested and to pay the net income therefrom to my daughter Katherine for and during her life.

"(b) On the death of my said daughter to pay, transfer and set over the principal of said fund to the lineal descendants of my said daughter equally per stirpes and not per capita.

"(c) If my said daughter shall leave no lineal descendants, to pay the net income therefrom to my son Bernard for and during his life, and upon his death to pay, transfer and set over the principal of said fund to the lineal descendants of my said son in equal shares, per stirpes and not per capita."

II. The principal dispositive provisions of the will of Annie W. Matthies are as follows:

"Fourth: All the rest, residue and remainder of my property and estate, both real and personal of whatsoever kind and wheresoever situate, I give, devise and bequeath as follows:

"A. One-half (½) thereof to my trustees hereinafter named In Trust Nevertheless to invest and keep the same invested and to pay the net income therefrom to my son Bernard H. Matthies, for and during his life, and upon his death to pay, transfer and set over the principal thereof to his lineal descendants, if any, who shall survive him, the issue of any deceased descendant to take

the share which the parent would have received hereunder, if living, in equal shares per stirpes and not per capita. If my said son shall leave no lineal descendant or descendants him surviving, then the principal of said fund shall be paid, transferred, and set over to my daughter, Katherine Matthies, or if she shall not be living at that time to her lineal descendants then surviving, the issue of any deceased descendant to take the share which the parent would have received if living in equal shares per stirpes and not per capita; but if there shall be no lineal descendant or descendants of my said daughter living at that time, the principal of said fund shall be divided among my next of kin then surviving as provided by the laws of the State of Connecticut for the distribution of personal property in case of intestacy.

"B. One-half (½) thereof to my trustees hereinafter named In Trust Nevertheless to invest and to keep the same invested and to pay the net income therefrom to my daughter Katherine Matthies for and during her life, and upon her death to pay, transfer and set over the principal thereof to her lineal descendants, if any who shall survive her, the issue of any deceased descendant to take the share which the parent would have received hereunder, if living, in equal shares per stirpes and not per capita. If my said daughter shall leave no lineal descendant or descendants her surviving, then the principal of said fund shall be paid, transferred and set over to my son Bernard H. Matthies, or if he shall not be living at that time to his lineal descendants then surviving, the issue of any deceased descendant to take the share which the parent would have received if living in equal shares per stirpes and not per capita; but if there shall be no lineal descendant or descendants of my said son living at that time, the principal of said fund shall be divided among my next of kin then surviving as provided

by the laws of the State of Connecticut for the distribution of personal property in case of intestacy."

APPENDIX B.

The following is a breakdown, by individuals, of interests presently held in the Matthies Trusts.

*Bernard Matthies*

(1) He has received outright ⅛ of the principal of the George E. Matthies Trust; this vested in possession on the death of Annie W. Matthies.

(2) He has a life estate consisting of income from a ⅔ share of the principal of the George E. Matthies Trust; this he received outright under the terms of his father's will.

(3) He has a contingent remainder as to ⅔ of the principal of the George E. Matthies Trust; this ⅔ share is currently providing income for Katherine Matthies for her life.

(4) He has a contingent remainder in the income from a ⅙ share of the George E. Matthies Trust; this remainder will vest in him if Katherine dies before him not survived by lineal descendants.

(5) He has a life estate in ½ of the fund placed in trust by Annie W. Matthies and is currently receiving the income therefrom.

(6) He has a contingent remainder in ½ of the fund placed in the Annie W. Matthies Trust; this share is currently providing income for Katherine, she having a life estate therein; this remainder will vest in him if Katherine dies before him without any lineal descendants surviving her.

*Katherine Matthies*

(1) She has received outright a life estate in the income from a ⅔ share of the fund in the George E. Matthies Trust; this vested in possession on the death of Annie W. Matthies.

(2) She has a life estate in the income of a ⅙ share of the fund in the George E. Matthies Trust; this she received

outright under the terms of her father's will.

(3) She has a contingent remainder consisting of a life estate in income from a ⅖ share of the fund in the George E. Matthies Trust, which ⅖ share is currently providing income for Bernard's life estate therein; this remainder will vest if Bernard dies before Katherine without lineal descendants surviving him.

(4) She has a contingent remainder in ½ of the principal of the Annie W. Matthies Trust, which ½ share is currently providing income for Bernard's life estate therein; this remainder will vest in her if Bernard dies before Katherine without lineal descendants surviving him.

(5) She has a life estate in the income of a ½ share of the fund placed in the Annie W. Matthies Trust and is currently receiving said income.

*George C., Richard, William, Franklin, and Roberta Matthies:*

These people answer the description of "lineal descendants" of Bernard Matthies at the present time. It is not clear from the will of George E. Matthies whether "lineal descendants" must survive until the date of Bernard Matthies' death in order to take anything under the will, e. g., if Roberta Matthies, who has no issue, should pre-decease Bernard Matthies, would her estate be able to claim a remainder interest under the terms of this trust? Generally, where the reference is to a class of persons (as it is here) having remainder interests, it is held that survivorship until the date of distribution (the termination of the preceding life estate) is required.

These descendants of Bernard Matthies now hold these interests:

(1) They have contingent remainders in a ⅖ share of the fund in the George E. Matthies Trust, which share is currently providing income to Katherine Matthies, she having a life estate therein; the vesting of this remainder is conditioned upon Bernard's death prior to Katherine's, followed by Katherine's death without lineal descendants surviving her.

(2) They have vested remainders subject to complete defeasance (also subject to open on the theory that Bernard's possibility of issue is not, in law, extinct) in a ⅖ share of the George E. Matthies Trust.

(3) They have contingent remainders in a ⅖ share of the fund in the George E. Matthies Trust, which share is currently providing income to Katherine Matthies, she having a life estate therein; the income from this share will go to Bernard for life if he survives Katherine and she dies without lineal descendants; after Bernard's death, the principal will vest in his lineal descendants.

(4) They have contingent remainders in a ½ share of the fund in the Annie W. Matthies Trust, which share is currently providing income to Bernard Matthies, he having a life estate therein; the express terms of Annie W. Matthies' will make survival of Bernard Matthies a condition precedent to vesting of this remainder.

(5) They have contingent remainders in a ½ share of the fund in the Annie W. Matthies Trust, which share is currently providing income to Katherine Matthies, she having a life estate therein; this remainder is subject to the double contingency of Bernard's death prior to Katherine's death with Katherine not survived by any lineal descendants, and, under the express terms of the will, of survival past the date of Katherine's death, not merely past the date of Bernard's death.

*Children of George C., Richard, William, Franklin, and Roberta Matthies:*

These people answer the description of "lineal descendants" of Bernard Matthies also; they therefore hold the same interests as their parents which have already been listed. It further appears that because of the "per stirpes" dis-

tribution called for by these wills, this class's chances of taking are subject to the additional contingency that their Matthies parent must predecease both them and Bernard Matthies. This class is also subject to possible enlargement because of the youthfulness of their parents.

### Unborn and Unascertained Lineal Descendants of Katherine Matthies:

The possibility that any member of this class will come into existence is extremely remote at best. Legally, however, the possibility exists, and since a fortune of tremendous proportions would devolve upon any lineal descendant of Katherine Matthies, the various interests now apparent in this class under these two trusts are listed.

(1) They have contingent remainders in a ⅔ share of the fund in the George E. Matthies Trust, which share is currently providing income to Katherine Matthies, she having a life estate therein; should any issue be born to Katherine, this remainder would vest immediately, subject to open and to complete defeasance.

(2) They have contingent remainders in a ⅔ share of the fund in the George E. Matthies Trust, which share is currently providing income to Bernard Matthies, he having a life estate therein; this remainder would vest in any descendant of Katherine who survived Katherine's death, provided Bernard predeceased Katherine without leaving surviving lineal descendants.

(3) They have a contingent remainder in a ⅘ share of the fund in the George E. Matthies Trust, which share is currently providing income to Katherine Matthies, she having a life estate therein; this remainder would vest in any lineal descendant of Katherine upon birth, subject to open and to complete defeasance.

(4) They have contingent remainders in a ½ share of the fund in the Annie W. Matthies Trust, which share is currently providing income to Katherine Matthies, she having a life estate therein; should any issue be born to Katherine Matthies this remainder would still not vest immediately, since survivorship of Katherine is made an express condition precedent to vesting.

(5) They have contingent remainders in a ½ share of the fund in the Annie W. Matthies Trust, which share is currently providing income to Bernard Matthies, he having a life estate therein; should any issue be born to Katherine Matthies, this remainder could not vest in them unless Katherine died prior to Bernard and Bernard died without lineal descendants surviving him, and the issue of Katherine survived both deaths.

### Next of Kin of Annie W. Matthies:

The provisions in the will of Annie W. Matthies for distribution of the principal of the trust therein created to her "next of kin", should both Katherine and Bernard Matthies die without surviving lineal descendants, could only mean that, in that eventuality, Mrs. Matthies desired the fund to be distributed as though she had died intestate, possessing property such as was in the fund, and not survived by a spouse, or children, or representatives of children, or parents. See General Statutes Conn., Sec. 7060; Daniels v. Daniels, 1932, 115 Conn. 239, 161 A. 94. Under the Connecticut statute of distribution, such property would be distributed "equally to the brothers and sisters of the whole blood and those who legally represent them."

This is the present picture:

(A) Ruth Wooster is a whole blood sister of Annie W. Matthies.

(B) Clara Wooster Merrill, deceased, was a whole blood sister of Annie W. Matthies. She was survived, and still is, by two children; she is presently additionally survived by four grandchildren and thirteen great grandchildren. Insofar as distribution is concerned, in

the present situation, property passing to these people under the intestate laws would be distributed one-half to Ruth Wooster, and one-quarter each to the two children of the deceased sister, namely George Herbert Merrill and William Merrill, since they are the "legal representatives" of Clara Wooster Merrill.

The interests of these next of kin are thus as follows:

(1) Contingent remainders in a ½ share of the fund in the Annie W. Matthies Trust, which share is currently providing income to Bernard Matthies, he having a life estate therein; this remainder is subject to the following contingencies:

(a) In the case of Ruth Wooster, George Herbert Merrill, and William Merrill—before these persons could take, Bernard Matthies must die without being survived by lineal descendants; so must Katherine Matthies.

(b) In the case of William Merrill, Jr., Jack Merrill, Imogene Merrill Dowdell, and Robert Merrill, all children of William Merrill—before these persons could take, all the conditions in (a) above must occur, with the additional contingency that William Merrill must also predecease them before then can act as "representatives" of Clara Wooster Merrill.

(c) In the case of the children of William Merrill, Jr., Jack Merrill, Imogene Merrill Dowdell, and Robert Merrill— before these persons could take, all the conditions in (a) and (b) above must occur, with the additional contingency that their aforementioned parents must also predecease them.

(2) Contingent remainders in a ½ share of the fund in the Annie W. Matthies Trust, which share is currently providing income to Katherine Matthies, she having a life estate therein; this remainder is subject to all the contingencies with respect to persons and events as are outlined in (1) (a), (b), and (c) above.